**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| SCAN HEALTH PLAN<br>3800 Kilroy Airport Way<br>Suite 100<br>Long Beach, CA 90806,<br><br>      *Plaintiff,*<br><br>  v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>CENTERS FOR MEDICARE & MEDICAID SERVICES<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the United States Department of Health and Human Services<br>200 Independence Avenue, S.W.<br>Washington, DC 20201,<br><br>MEHMET OZ, in his official capacity as Administrator, Centers for Medicare & Medicaid Services<br>7500 Security Boulevard<br>Baltimore, MD 21244,<br><br>      *Defendants.* | Civil Action No. <u>1:26-cv-2391-CRC</u> |

**<u>FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>**

Plaintiff SCAN Health Plan ("SCAN") brings this suit against Defendants the United

States Department of Health and Human Services ("HHS"); Robert F. Kennedy, Jr., in his official

capacity as Secretary of HHS; the Centers for Medicare & Medicaid Services ("CMS"); and

1

Mehmet Oz, in his official capacity as Administrator of CMS, and alleges as follows:

## PRELIMINARY STATEMENT

1.      This case concerns Defendants' unlawful actions in determining SCAN's 2026 Star Rating under CMS's Medicare Advantage program in violation of CMS's governing statute.

2.      SCAN is a California nonprofit healthcare plan whose mission is to keep its over 435,000 members healthy and independent.

3.      For the last several years, JD Power has ranked SCAN in the top two or three Medicare Advantage plans in California for customer satisfaction.[1]  And year after year, SCAN has been named to U.S. News and World Report's list of Best Medicare Advantage plans.[2]  It is thus no surprise that in 2026 SCAN surged into the top ten Medicare Advantage plans nationally.[3]

4.      Under the Medicare Advantage program, the Secretary of HHS, acting through CMS, contracts with private healthcare plans like SCAN to provide benefits that meet or exceed the benefits provided by government-run Medicare.  Balanced Budget Act of 1997, Pub. L. No. 105-33, § 4001, 111 Stat. 251, 275-327 (1997).

5.      Congress's principal tool to promote competition among Medicare Advantage health plans is known as a "Star Rating," which synthesizes a range of quality data about each plan

---

[1] *See, e.g.*, Press Release, J.D. Power, 2023 U.S. Medicare Advantage Study (May 11, 2023), https://www.jdpower.com/business/press-releases/2023-us-medicare-advantage-study;      Press Release, J.D. Power, 2024 U.S. Medicare Advantage Study (May 8, 2024), https://www.jdpower.com/business/press-releases/2024-us-medicare-advantage-study;      Press Release, J.D. Power, 2025 U.S. Medicare Advantage Study (May 7, 2025), https://www.jdpower.com/business/press-releases/2025-us-medicare-advantage-study.

[2] *See, e.g.*, Abby Berkowitz, *Best California Medicare Advantage Plans*, U.S. News & World Rep. (Oct. 16, 2025), https://health.usnews.com/medicare/best-california-medicare-advantage-plans.

[3] *See* Press Release, SCAN Health Plan, SCAN Health Plan Surges Into the Top 10 of Medicare Advantage Plans Nationally (Feb. 19, 2026), https://www.scanhealthplan.com/about-scan/press-releases/top-10-medicare-advantage-plans.

into a summary rating of 1 to 5 Stars (including half-Stars in between). Those Star Ratings directly determine the payments that plans receive from the government, amounting to hundreds of millions of dollars *per plan* and billions of dollars in the aggregate dependent on the Star Ratings.

6.   But the Star Ratings program went off the rails years ago and bears little resemblance to the program that Congress envisioned. Congress's own independent research arm for Medicare studies has concluded that the Star Ratings program is "overly complex," "distributes financial rewards inequitably," and "reports inaccurate information on quality."[4]

7.   The fundamental problem is that whereas Congress envisioned a stable, consistent Star Ratings program characterized by a limited number of validated "measures" of quality (*e.g.*, the percentage of plan members receiving recommended preventative health screenings) that CMS would develop in consultation with plans and the public, CMS has instead chosen to unilaterally change the measures of quality and the contours of the Stars program each and every year.

8.   The system is undeniably broken, as many courts, including this Court, have recognized.

9.   Just a few years ago, SCAN came to this Court to correct a blatant deficiency in a new Star Ratings methodology that CMS introduced at the eleventh hour by unilateral proclamation, without observance of the required procedure, and contrary to its own binding regulations. *See SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *1 (D.D.C. June 3, 2024).

---

[4] Medicare Payment Advisory Comm'n, Replacing the Medicare Advantage Quality Bonus Program, in Report to the Congress: Medicare and the Health Care Delivery System, ch. 3 at 51 (June 2020), https://www.medpac.gov/wp-content/uploads/import_data/scrape_files/docs/default-source/reports/jun20_ch3_reporttocongress_sec.pdf.

10. At baseline, that unilateral shift by CMS punished plans by suddenly changing the required benchmarks for "good" performance, in violation of CMS's own regulations. *Id.* at *6.

11. Two different judges of this Court held that CMS's last-minute change was invalid and issued party-specific judgments to relieve the two plans that brought these claims of their party-specific Star Ratings, without awarding system-wide relief. *Id.* (Nichols, J.); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25 (D.D.C. 2024) (Moss, J.).

12. CMS then implemented those judgments by recalculating the 2024 Star Ratings for *all* plans by applying the judgments' reasoning to all plans, raising Star Ratings for numerous plans and resultant plan funding.[5]

13. A few weeks ago, a judge on the United States District Court for the Southern District of Georgia identified similar, fundamental flaws in the Star Ratings program in a detailed and carefully reasoned 70+ page opinion. *Clover Ins. Co. v. HHS*, 2:25-CV-142, 2026 WL 1483515, at *1 (S.D. Ga. May 27, 2026).

14. First, the Southern District of Georgia held that ten measures could not be validly applied to plaintiff Clover Insurance Company ("Clover") to determine its 2026 Star Rating because they exceeded CMS's statutory authority under 42 U.S.C. § 1395w-23(o) and § 1395w-22(e). *Id.* at *8-14. That is, CMS had unilaterally adopted measures that Congress forbade CMS from using at all. *Id.*

15. Second, that court held that another set of ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2). *Id.* at *22-25.

---

[5] CMS, *Update to 2025 Quality Bonus Payment Determinations* (June 13, 2024), https://www.cms.gov/files/document/updateto2025qualitybonuspaymentdeterminations.pdf.

16.     But, rather than apply the judgment as to all plans, on June 17, 2026, CMS announced that it only partially implemented the reasoning of the *Clover* decision in recalculating certain plans' 2026 Star Ratings.

17.     Specifically, CMS recalculated certain plans' Star Ratings in accordance with *only* the first holding in *Clover*, namely, with removal of the ten measures that the Southern District of Georgia had identified as in excess of CMS's statutory authority.  CMS, *Update to 2027 Quality Bonus Payment Determinations* (June 17, 2026) ("Recalculation Memo").[6]

18.     Critically, CMS did *not* recalculate plans' 2026 Star Ratings in accordance with the *second* holding of the Southern District of Georgia, namely, with removal of the ten measures that the court had identified as having been promulgated by CMS in its unilateral program guidance, rather than "by regulation" in the manner required by 42 U.S.C. § 1395hh(a)(2).

19.     What SCAN seeks here is the full implementation of the Southern District of Georgia's decision's second holding, by removing the ten measures that the Southern District of Georgia held CMS failed to promulgate by regulation.

20.     The Southern District of Georgia's second holding regarding these unlawfully promulgated measures was plainly correct.

21.     As noted, CMS determines each plan's Star Rating by calculating a "measure score" for each plan on various "measures," such as how often plan members obtain recommended mammograms and other cancer screenings, and how well their blood sugar and blood pressure are controlled.  CMS then engages in a multi-step process to grade plans relative to other plans, akin to grading on a "curve" in a college course.

---

[6] CMS also removed some measures that it apparently concluded (without explanation) were encompassed by the reasoning of the first *Clover* holding despite the Georgia federal court not reaching them.  *Id.*

22.     While CMS has codified in the Code of Federal Regulations almost all relevant aspects of the Star Ratings system, there is a notable exception: CMS has not codified, or as a general matter subjected to notice-and-comment rulemaking, the specifications for the *measures* CMS applies, *i.e.*, the most important aspect of the Star Rating system.

23.     Instead, CMS unilaterally promulgates its Star Ratings measure specifications in hundreds of pages of so-called "technical notes" that CMS publishes each year, morphing the measures and their technical specifications each year without notice and comment rulemaking and publication in the Code of Federal Regulations. *See, e.g.*, CMS, Medicare 2026 Part C & D Star Rating Tech. Notes (Sept. 25, 2025) (hereafter "2026 Pt. C & D Star Ratings Tech. Notes"), https://www.cms.gov/files/document/2026-star-ratings-technical-notes.pdf.

24.     But curtailing CMS's ability to unilaterally shift measures on plans from year to year is exactly what Congress intended. *See Clover Ins. Co.*, 2026 WL 1483515, at *22-25.

25.     The Supreme Court has explained that, given the dramatic consequences for the overall healthcare system resulting from CMS's regulation of Medicare, Congress provided expanded notice-and-comment obligations for rules, requirements, and even non-binding, agency policies impacting substantive legal standards for Medicare. *See Azar v. Allina Health Servs.*, 587 U.S. 566, 579 (2019).

26.     Specifically, Congress provided any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive benefits," must be promulgated "by regulation," *i.e.*, published notice in the Code of Federal Regulations and subjected to notice and comment rulemaking.  42 U.S.C. § 1395hh(a)(2).

27.     The Southern District of Georgia correctly held that, with respect to the ten measures Clover challenged on this ground (known as C03, C04, C05, C15, C16, C22, C23, C24, C25, C27), those measure specifications constituted "substantive legal standard[s]" that did "govern the payment for services because they serve as a 'deciding principle' for such payments." *Clover Ins. Co.*, 2026 WL 1483515, at *24 (quoting *Govern*, Webster's III New Int'l Dictionary 982).

28.     The court's reasoning was straightforward: Star Ratings measures directly determine hundreds of millions of dollars of statutorily-mandated payments to each plan, and thus provide substantive legal standards governing payments for services.  *See id.*

29.     In other words, if measures of quality that determine hundreds of millions of dollars in payments to plans were not the type of substantive legal standards that require CMS to act "by regulation," then what would be?

30.     Accordingly, because those ten measures had not been promulgated "by regulation," they could not be applied to Clover to determine its 2026 Star Rating.  *Id.* at *25.

31.     After CMS recalculated SCAN's 2026 Star Rating in accordance with only the *Clover* court's *first* holding on June 17, 2026, on June 29, 2026, SCAN contacted CMS, requesting that CMS re-determine SCAN's 2026 Star Rating to remove the ten measures that the Southern District of Georgia had identified in its second holding could not be lawfully applied.

32.     SCAN further explained that it was prepared to immediately resubmit a revised Medicare Advantage bid for the 2027 plan year in accordance with its revised 2026 Star Rating and related revenue increases, and requested CMS's direction for how to do so.  *Id.*

33.     CMS denied SCAN's request to correct its recalculated Star Rating and submit a revised bid at 4.5 Stars that same day, maintaining that CMS's recalculation would not apply the Georgia court's second holding pertaining to the second set of ten measures it held invalid.

34.     Respectfully, CMS's decision to determine SCAN's 2026 Star Rating without applying the Southern District of Georgia's second holding violates governing law.

35.     CMS's application of the ten disputed measures (C03, C04, C05, C15, C16, C22, C23, C24, C25, C27) resulted in CMS's unlawful determination of SCAN's 2026 Star Rating at 4 Stars, rather than 4.5 Stars.  Removing those ten measures from the weighted average that determines SCAN's overall Star Rating raises SCAN's rating across the 4.5-Star threshold. Because CMS's determination of SCAN's Star Rating was contrary to law, the Administrative Procedure Act ("APA") requires that it be set aside.  5 U.S.C. § 706(2).

36.     CMS's unlawful determination of SCAN's Star Rating at 4 Stars reduces the funding that SCAN would otherwise be entitled to under a 4.5 Star Rating, to the tune of $125 million in statutorily mandated payments available under a 4.5 Star rating that SCAN can, by law, then use to increase benefits or reduce cost sharing for its members, improving the plan's competitiveness and profitability.

37.     CMS's unlawful determination and public dissemination of SCAN's 4.0 Star Rating (and related measure-specific Star Ratings), rather than its corrected 4.5 Star Rating under governing law, also imposes significant reputational and competitive harms.

38.     To prevent SCAN from suffering this harm, SCAN respectfully requests that the Court vacate SCAN's 2026 Star Rating and order CMS to recalculate SCAN's 2026 Star Rating without reliance on the ten unlawful measures identified herein.

39.    That leaves the significant matter of timing of a judicial decision.  SCAN will seek to promptly meet and confer with Defendants immediately following filing of this Complaint, and will seek to establish an agreed briefing schedule consistent with CMS's representations on the necessary timing to award efficient and efficacious relief.  Historically, CMS had taken the position that it needed a decision in advance of the annual June Medicare Advantage bidding deadline to provide efficient and efficacious relief.[7]  More recently, in the *Clover* matter, CMS took the position that it is able to award efficient and efficacious relief at a later time, even many months later, and there is no need for an expedited decision.  *See, e.g.,* Reply In Support of Motion To Stay at 3, *Clover Ins. Co. v. HHS*, No. 2:25-cv-142-LGW-BWC, (S.D. Ga. Apr. 29, 2026), ECF No. 31 ("Defendants affirmatively state that CMS does not require such a decision by May 29, 2026, in order to effect appropriate judicial relief."); *id.* at 3-4 (arguing that later relief is possible because "[n]umerous other district courts have decided Star Ratings cases after the end of May" (citing *Blue Cross & Blue Shield of Mass., Inc. v. Kennedy*, No. 1:25-cv-693, 2025 WL 3062827 (D.D.C. Nov. 3, 2025) and *Humana, Inc. v. U.S. Dep't of Health & Hum. Servs.*, No. 4:25-cv-779, 2025 WL 2909960 (N.D. Tex. Oct. 14, 2025)); *id.* at 4 n.1 (noting that in *Blue Cross & Blue Shield*, a decision in "November 2025," 5 months after bidding deadline, had "no obvious ill effects attributable to the issuance of a decision at that time"); Response to Plaintiffs' Request For Excess Pages at 3, *Clover Ins. Co. v. HHS*, No. 2:25-cv-142 (S.D. Ga. Apr. 17, 2026), ECF No. 54 (same).

---

[7] *See Elevance Health*, 736 F. Supp. 3d at 13 ("Both parties have requested expedited consideration of . . . summary judgment in light of Plaintiffs' impending deadline to submit their bids to CMS for the upcoming contract year."); Joint Mot. for Briefing Schedule at 1, *SCAN Health Plan v. Dep't of Health & Human Servs.*, No. 1:23-cv-03910-CJN (D.D.C. Feb. 23, 2024), ECF No. 19 ("The parties have developed this scheduling proposal to allow for expedited summary judgment briefing in advance of the June 3, 2024 deadline for Medicare Advantage bids . . . ."); Notice of Joint Proposed Briefing Schedule at 4, *Clover Ins. Co. v. Becerra*, 1:24-cv-01385-BAH (D.D.C. June 7, 2024), ECF No. 12 (similar).

SCAN will seek to confer with Defendants on this issue to establish an appropriate briefing schedule.

## PARTIES

40.    SCAN is a leading provider of Medicare Advantage health insurance plans.  It is incorporated in and has its principal place of business in California.

41.    HHS is a department of the Executive Branch of the United States.  Its headquarters and principal place of business are at 200 Independence Ave, SW, Washington, DC 20201.  Its governmental activities occur nationwide.

42.    Robert F. Kennedy, Jr., sued solely in his official capacity, is Secretary of HHS.  In this capacity, Secretary Kennedy has ultimate responsibility for activities at HHS, including the actions complained of herein.  His governmental activities occur nationwide.

43.    CMS is a federal agency within HHS.  Its headquarters and principal place of business are at 7500 Security Boulevard, Baltimore, MD 21244.  Its governmental activities occur nationwide.

44.    Dr. Mehmet Oz, sued solely in his official capacity, is Administrator of CMS.  In this capacity, Administrator Oz has ultimate responsibility for activities at CMS, including the actions complained of herein.  His governmental activities occur nationwide.

## JURISDICTION, VENUE, AND EXHAUSTION

45.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

46.    This action arises under the APA, 5 U.S.C. §§ 701-706 and the United States Constitution.  SCAN's prayers for a declaratory judgment and injunctive relief are authorized by the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202; the APA, 5 U.S.C. §§ 701-706; and 28 U.S.C. § 1361.

47.    Venue is proper in this District under 28 U.S.C. § 1391(e) because at least one Defendant is an officer or agency of the United States and resides in this District.

48.    Any requirement for administrative exhaustion has been satisfied. CMS allows plans to examine the data used to calculate their Star Rating and appeal certain determinations. It does not, however, allow plans to challenge "the methodology for calculating the star ratings." 42 C.F.R. § 422.260(c)(3)(ii). Thus, any challenge to the lawfulness of measures applied to a plan is not subject to any administrative review process. *See SCAN Health Plan v. HHS*, No. 23-CV-3910, 2024 WL 2815789, at *4 n.3 (D.D.C. June 3, 2024). Nevertheless, SCAN raised its concerns about the use of these measures to determine SCAN's 2026 Star Rating to CMS through a submission on June 29, 2026, objecting to CMS's determination of SCAN's 2026 Star Ratings through application of the ten disputed measures that had not been promulgated "by regulation" (C03, C04, C05, C15, C16, C22, C23, C24, C25, C27). CMS responded that same day refusing to grant SCAN its requested relief or determine SCAN's Star Ratings in accordance with its objections stated herein.

## BACKGROUND

### A.    The Medicare Advantage Program

49.    The Medicare program, established by Title XVIII of the Social Security Act (the "Act"), provides government-funded health insurance to seniors and the disabled. *See* 42 U.S.C. § 1395, *et seq*.

50.    Under the Act, beneficiaries enrolled under "Original Medicare" (Medicare Parts A and B) receive benefits for covered medical services directly from the federal government. *See* 42 U.S.C. §§ 1395c to 1395i-6, 1395j to 1395w-6.

51. Under Medicare Part C, beneficiaries may alternatively elect coverage under the "Medicare Advantage" program, which Congress created in 1997. *See id*. § 1395w-21; § 4001, 111 Stat. at 275-327.

52. This program allows CMS to contract with private Medicare Advantage plans, which provide Medicare-covered benefits.

53. As a part of the Medicare Modernization Act of 2003, Congress also established Medicare Part D, effective in 2006. Pub. L. 108-173, § 101, 117 Stat. 2066, 2071-72 (2003).

54. Medicare Part D is an optional prescription drug benefit. Enrollees in Medicare Advantage plans may choose whether to enroll in these optional Part D benefits. *See generally* 42 U.S.C. §§ 1395w-101 to 1395w-104.

55. Medicare Advantage plans must include the same level of benefits offered by Original Medicare (Medicare Parts A and B)—although Medicare Advantage plans may also offer supplemental benefits, such as optical or dental benefits. *See generally* 42 U.S.C. § 1395w-22.

56. Medicare Advantage plans compete to encourage beneficiaries to select their plans by offering high-quality care, supplemental benefits, and lower premiums/cost sharing. *See id.*

57. To fund Medicare Advantage benefits, the government pays plans a pre-determined monthly sum for each plan enrollee, determined through a bidding system. *See id.* § 1395w-23.

58. Each year, CMS establishes "benchmark" rates that are meant to represent what it would cost CMS to provide Medicare benefits to an average enrollee in each county. *See id.* § 1395w-23(b)(1)(B). Plans then submit bids for the estimated cost for covering Medicare-defined standard benefits to an average enrollee for the upcoming year. *See id.* § 1395w-23(a)(1)(B).

59. If a plan bids below the benchmark, CMS returns a portion of the difference to the plan as a "rebate," which plans can use, among other things, to reduce member cost sharing, lower

12

Part D premiums, and offer supplemental benefits not included in traditional Medicare.  *See, e.g.*, *id.* §§ 1395w-23(a)(1)(E), 1395w-24(a)(6)(A).

### B.   Statutory Star Ratings And Quality Bonus Payments

60.   CMS has published raw data about Medicare Advantage plan quality and performance since 1998.  *See* 83 Fed. Reg. at 16,520.

61.   But in 2008, CMS began publishing annual Star Ratings, which rate Medicare Advantage plans on a scale of 1 to 5 Stars, including half-Stars, with 5 Stars being the highest.  *Id*.

62.   Congress had not expressly authorized Star Ratings when CMS began publishing them in 2008.  Instead, Star Ratings were a creature of CMS sub-regulatory guidance.  *See id.*

63.   In 2010, Congress codified in part and overrode in part CMS's Star Ratings system.

64.   The Affordable Care Act—as amended by the Healthcare and Education Reconciliation Act—introduced the Quality Bonus Payment program, which incorporated Star Ratings into two statutory formulas that determine certain payments to Medicare Advantage plans. *See* Pub. L. 111-152, § 1102(c)-(d), 124 Stat. 1029, at 1043-46 (2010).

65.   The first formula, codified at 42 U.S.C. § 1395w-23(o) and known as the quality bonus payment, rewards Medicare Advantage plans rated 4 Stars or higher with an increased 5 percent benchmark against which to bid.

66.   That effectively either increases the total amount of money the plan is eligible to receive, including in the form of a rebate (if its bid is below the benchmark) or reduces the premium the plan must charge its members (if its bid is above the benchmark).

67.   The second formula, codified at 42 U.S.C. § 1395w-24(b)(1)(C), gives higher-rated plans a larger portion of the difference between their bid and their benchmark back as a rebate as follows: 3 Stars and lower receive 50 percent; 3.5 and 4 Stars receive 65 percent, and 4.5 and 5 Stars receive 70 percent.  Rebates are used to lower patient cost sharing and premiums, and fund

supplemental benefits not offered under traditional Medicare, such as dental and vision benefits. *See, e.g.*, 85 Fed. Reg. 33,796, 33,885-86 (June 2, 2020).[8]

68.    Congress provided that the "quality rating for a plan shall be determined according to a 5-star rating system (based on the *data collected under section 1395w-22(e) of this title*)." *Id.* § 1395w-23(o)(4)(A) (emphasis added).

69.    That is, Congress required the Star Ratings to be based upon the data collected under plans' quality assurance programs as of November 1, 2003. *Id.* § 1395w-22(e)(3)(A)(i).

70.    In this way, Congress required CMS to focus on well-established types of data concerning clinical quality, health outcomes, and beneficiary satisfaction. *See id.*

**C.    CMS's Annual Determination And Publication Of Star Ratings**

71.    Star Ratings are determined annually, in what boils down to a four-step process:

72.    *First*, CMS calculates a raw "measure score" on dozens of "measures." *See* CMS, *2026 Star Ratings Measures and Weights* (2025) [hereinafter *2026 Star Ratings Measures & Weights*], https://www.cms.gov/files/document/2026-star-ratings-measures.pdf.

73.    A "measure score" is the plan's raw score on each measure—usually expressed as a percentage. *See* 42 C.F.R. §§ 422.162(a), 422.166(a)(1), (a)(4) (Part C); *id.* §§ 423.182(a), 423.186(a)(1), (a)(4) (Part D).

74.    A Medicare Advantage plan will receive over 40 of these raw measure scores each year on various measures. *See generally 2026 Star Ratings Measures & Weights.*

75.    Each measure is derived from a specified data source, such as the Healthcare Effectiveness Data and Information Set ("HEDIS"), the Health Outcomes Survey ("HOS"), the

---

[8] Moreover, rebates can also be used to increase payments for core (non-supplemental) Medicare Advantage benefits, since every additional dollar of rebates to fund supplemental benefits is a dollar freed up and made available that the plan may use to fund core benefits.

Consumer Assessment of Healthcare Providers and Systems ("CAHPS"), or administrative data, with that source identified in CMS's annual Technical Notes. 83 Fed. Reg. at 16,537-46.

76. For example, the "Breast Cancer Screening" measure uses HEDIS data to measure the "[p]ercent of female plan members aged 52-74 who had a mammogram during the past 2 years." 83 Fed. Reg. at 16,538. The "Annual Flu Vaccine" measure uses CAHPS data to measure the "[p]ercent of plan members who received an influenza vaccination prior to flu season." *Id.* at 16,539. And the "Reducing the Risk of Falling" measure uses HEDIS and HOS data to track the "[p]ercent of plan members 65 years of age or older who had a fall or had problems with balance or walking in the past 12 months, who were seen by a practitioner in the past 12 months and received fall risk intervention from their current practitioner." *Id.* at 16,541.

77. *Second*, CMS uses statistical "clustering" to identify plans with similar "measure scores" and sets "cut points" for these "measure scores." By doing so, CMS divides plans between the Star Rating levels. 42 C.F.R. §§ 422.166(a)(1), (a)(2), (a)(4), 423.186(a)(1), (a)(2), (a)(4).

78. *Third*, CMS converts the raw measure score, for each measure, into a measure-specific Star Rating between 1 and 5. 42 C.F.R. §§ 422.166(a)(1), (a)(4), 423.186(a)(1), (a)(4).

79. *Fourth*, CMS takes a weighted average of each plan's individual measure-specific Star Ratings. *See* 42 C.F.R. §§ 422.166(c)(1), (d)(1), 423.186(c)(1), (d)(1). This weighted average determines the plan's overall Star Rating.

80. The annual Star Ratings are released each October, prior to the annual open enrollment period for Medicare Advantage. The year associated with Star Ratings corresponds to the year for the open enrollment period, because the Star Ratings help Medicare beneficiaries identify high performing plans to enroll in for the upcoming plan year.

81.    For example, the Star Ratings released on October 9, 2025 are referred to as the "2026 Medicare Part C & D Star Ratings" because they are published prior to the 2026 open enrollment period, which occurred in late 2025. *2026 Pt. C & D Star Ratings Tech. Notes*, at 1.

82.    Meanwhile, the *data* underlying the 2026 Star Ratings were collected during 2024, and the 2026 Star Ratings will impact *payments to plans* in 2027. *See e.g.*, *id.* at 54 (noting the data time frame for a measure was within 2024).

83.    CMS displays Star Ratings, both overall Star Ratings and measure-specific Star Ratings for each measure, as part of its online "Plan Finder" tool, which seniors use to research, compare, and sign up for Medicare Advantage plans.

84.    Higher-rated plans are displayed higher than lower-rated plans, thus helping them attract a disproportionate share of enrollment.

**D.    Notice And Comment On The Star Ratings Measures**

85.    Under CMS's current methodology, Star Ratings measures change each year.

86.    Due to these "regular updates and revisions," CMS does not codify its Star Ratings measures in the Code of Federal Regulations, but rather lists out its measures for a given year in its annual Technical Notes. 83 Fed. Reg. at 16,537.

87.    The Technical Notes provide a partial, summary description of the specifications for each measure, *i.e.*, the data sources on which it is based and how it is determined.

88.    To actually determine each measure, however, it is necessary to utilize the detailed specifications contained in CMS's other sub-regulatory guidance, including specific "Technical Notes" pertaining to each measure. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (partially specifying calculation of C33 and D01 measures, among other sources of guidance).

16

89.     For the 2026 Star Ratings, CMS originally utilized 33 measures for Part C ("C01-C33") and 12 measures for Part D ("D01-D12").  *See generally 2026 Star Ratings Measures & Weights*.

90.     Before evaluating a plan with a given Star Ratings measure, CMS must undertake public notice-and-comment rulemaking concerning that measure.  This obligation stems from two separate sources of law relevant to this case.

91.     *First*, since 2018, CMS's regulations have provided that, before adding a "new" measure, or making substantial changes to a measure's specifications, CMS must first publicly propose the measure (on its website), elicit public feedback prior to the measurement year, *and then* formally engage in notice-and-comment rulemaking.  *See* 42 C.F.R. § 422.164(c)(2) ("In advance of the measurement period, CMS will announce potential new measures and solicit feedback through the process described for changes in and adoption of payment and risk adjustment policies in section 1853(b) of the Act [42 U.S.C. § 1395w-23] and then subsequently will propose and finalize new measures through rulemaking."); *id.* § 423.184(c)(2) (same for part D); *id.* §§ 422.164(d)(2), 423.184(d)(2) (same procedure applies for substantial changes to measure).

92.     Because the majority of CMS's Star Rating measures predate CMS's 2018 regulations requiring notice-and-comment rulemaking, most have not undergone rulemaking.

93.     Moreover, even where CMS has engaged in notice and comment, it has taken a casual approach inconsistent with the APA and regular notice-and-comment rulemaking.

94.     Specifically, CMS has taken the position that this regulatory notice-and-comment obligation does *not* require *traditional* notice-and-comment rulemaking in the normal APA sense, *i.e.*, disclosing CMS's intended changes and seeking comment on those changes, but rather merely

17

requires CMS to provide notice to the public it intends to do *something*—anything—to change the measure, and then CMS can do as it wishes to change the measures, regardless of whether that change is a logical outgrowth of CMS's original proposal.  *See* Defs.' Mot. For Summ. J. at 23-24, *Clover Ins. Co. v. HHS*, No. 2:25-cv-142-LGW-BWC (S.D. Ga. Apr. 9, 2026), ECF No. 51 .

95.    *Second*, CMS has a statutory obligation to promulgate Star Ratings measures "by regulation," *i.e.*, through notice-and-comment rulemaking and promulgation in the Code of Federal Regulations.

96.    CMS must promulgate "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter" pursuant to 42 U.S.C. § 1395hh(a)(2); *Allina*, 587 U.S. at 569-70 (recognizing that "Congress chose to write a new, Medicare-specific" "notice-and-comment regime" under § 1395hh).

**E.    CMS's Determination and Recalculation of SCAN's 2024 Star Rating**

97.    There have been multiple Star Ratings challenges in recent years that have resulted in multiple "recalculations" of plans' Star Ratings.

98.    The first recalculation occurred in 2024 following a pair of decisions in this Court holding that the methodology that CMS used to determine the "cut points" for a 3, 4, 5, etc. Star Rating for SCAN, as well as a second health plan, was contrary to CMS's regulations.  *SCAN Health Plan v. HHS*, No. 1:23-cv-3910-CJN, 2024 WL 2815789, at *6 (D.D.C. June 3, 2024) (Nichols, J.); *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25 (D.D.C. 2024) (Moss, J.).

99.    Specifically, SCAN argued that CMS had erroneously determined its 2024 Star Rating at 3.5 Stars, rather than 4.0 Stars, because CMS had failed to apply the mandatory text of its regulations.  *SCAN*, 2024 WL 2815789, at *6.  Elevance raised a similar challenge.

18

100.    The Court agreed with SCAN and Elevance that their 2024 Star Ratings had been calculated in error.

101.    In response to the Court's party-specific orders, CMS did not merely implement the party-specific relief that those cases provided for SCAN's and Elevance's plans.

102.    Rather, CMS implemented those judgments by recalculating the 2024 Star Ratings for *all* plans, and allowed plans to re-submit their bids for the following plan year in accordance with their recalculated Star Ratings.  CMS, U.S. Dep't of Health & Hum. Servs., *Update to 2025 Quality Bonus Payment Determinations*.

103.    As a result of its judgment and CMS's recalculation, SCAN's 2024 Star Rating increased from 3.5 Stars to 4.0 Stars, resulting in over $200 million in quality bonus payments.

**F.    CMS's Determination of SCAN's 2026 Star Rating and the *Clover* Lawsuit**

104.    On October 9, 2025, CMS issued SCAN's 2026 Star Rating as 4 Stars.

105.    As a direct consequence of that 4-Star rating, CMS again awarded SCAN over $250 million in quality bonus payments and rebates.

106.    Meanwhile, Clover filed suit in the United States District Court for the Southern District of Georgia on November 7, 2025, challenging the application of a number of measures used to calculate the 2026 Star Ratings.  Compl., *Clover Ins. Co. v. HHS*, No. 2:25-cv-142-LGW-BWC (S.D. Ga. Nov. 7, 2025), ECF No. 1.

107.    Clover challenged its 2026 Star Rating—which determines payments to the plan for plan year 2027.  *See id.*

108.    The Southern District of Georgia ultimately granted in part Clover's motion for summary judgment, based on two primary holdings.  *See Clover Ins. Co.*, 2026 WL 1483515, at *1.

109.   First, the Southern District of Georgia held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they exceeded CMS's statutory authority under 42 U.S.C. §1395w-23(o) and §1395w-22(e).  *Id.* at *8-14.[9]

110.   Second, that court held that ten measures could not be validly applied to Clover to determine its 2026 Star Rating because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).  *Id.* at *22-25.

111.   More specifically, Congress provided a specific notice-and-comment requirement for Medicare, providing that any "rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive benefits," must be promulgated "by regulation," *i.e.*, published notice in the Code of Federal Regulations and subjected to notice and comment.  42 U.S.C. § 1395hh(a)(2).

112.   The Southern District of Georgia correctly held that Star Ratings measure specifications qualify as "statement[s] of policy" for purposes of § 1395hh(a)(2), a point that CMS did not dispute.  *See Clover Ins. Co.*, 2026 WL 1483515, at *22 (citing *Allina*, 587 U.S. at 572).

113.   "Star Ratings measure specifications qualify as statements of policy" that must be promulgated by regulation under § 1395hh(a)(2) because they "let the public know the agency's

---

[9] In a separate holding, that court determined that CMS is required to maintain measures that are based on the "types of data" CMS used in 2003, rather than new types of data post-dating 2003, but that CMS had not violated that mandate with respect to the 3 specific measures Clover challenged on that ground.  *Id.* at *15-21 (citing 42 U.S.C. § 1395w-22(e)(3)(B)(i)).

current adjudicatory approach to a critical question involved in calculating ratings for Medicare Advantage plans nationwide." *Id.*

114.    The court also correctly held that, with respect to the ten measures that Clover challenged on this ground (known in Medicare parlance as C03, C04, C05, C15, C16, C22, C23, C24, C25, C27), those measures' specifications each provided a "substantive legal standard," a point that CMS, again, did not contest. *Id.* at *22-23.

115.    The measure specifications constitute a "substantive legal standard" because "CMS's Star Rating calculations function to define the scope of [Medicare Advantage Organizations'] legal rights to rebates by impacting the percent of per capita savings a plan can receive." *Id.* at *23.

116.    Finally, the court found that the subject standards did in fact "govern the payment for services because they serve as a 'deciding principle' for such payments." *Id.* at *24 (quoting *Govern*, Webster's III New Int'l Dictionary 982).

117.    As the court explained, "CMS is . . . obligated by statute to offer additional funding to plans with better Star Ratings" and "[t]he fact that the ratings trigger statutorily mandated funding increases is more than mere influence or an indirect effect; it is a deciding principle in the payment amount." *Id.*

118.    Therefore, CMS's decision to use the ten disputed measures to determine Clover's 2026 Star Rating "trigger[ed] the notice-and-comment requirements in Section 1395hh(a)(2)," and CMS's failure to engage in the required notice-and-comment rulemaking with respect to those

measures made the calculation of Clover's 2026 Star Rating with these measures procedurally invalid. *Id.* at *25.

### G.    CMS's Recalculation of SCAN's 2026 Star Rating

119.    Given plans' experience with the "recalculation" following the 2024 *SCAN* and *Elevance* cases, plans were closely watching *Clover* with the expectation that, if that case were resolved in Clover's favor, CMS was likely to engage in a similar recalculation for all plans.

120.    That expectation was not fulfilled by CMS.

121.    CMS's second recalculation occurred 3 weeks after the *Clover* court's ruling, as of June 17, 2026.

122.    CMS issued a memorandum on June 17, 2026, announcing an update to the 2026 Star Rating calculations (which impact 2027 plan payments) in light of the decision, and that CMS had issued recalculated Star Ratings.  Recalculation Memo at 1.

123.    The memorandum explained that CMS "recalculated the 2027 [Star] ratings for MA [Medicare Advantage] organizations using only data collected under 42 U.S.C. § 1395w-22(e) as of November 1, 2003."  *Id*.  In other words, CMS would recalculate plans' Star Ratings with the removal of the ten measures impacted by the Southern District of Georgia's *first* holding, namely, that CMS applied those measures in violation of 42 U.S.C. § 1395w-23(o) and § 1395w-22(e) (plus certain other measures that it apparently deemed outside of those authorities).

124.    The memorandum also invited plans whose overall Star Ratings had increased as a result of the recalculation to resubmit their bids for plan year 2027, in light of the significant revenue effects that the Star Ratings changes would have on the bids.[10]

---

[10] It appears that CMS recalculated SCAN's Star Rating pursuant to the terms of the Recalculation Memo, and determined that SCAN maintained its 4.0 Star Rating with removal of the measures identified in the Recalculation Memo.  More generally, CMS applied the recalculation on a "hold

125.    However, the Recalculation Memo did not provide for a recalculation removing the measures impacted by the Southern District of Georgia's decision—specifically the measures that the *Clover* court held invalid because CMS had not promulgated those measures "by regulation." *Compare* Recalculation Memo, *with Clover Ins. Co.*, 2026 WL 1483515, at \*22-25.

**H.    SCAN Raises CMS's Recalculation Error to CMS on June 29, 2026**

126.    SCAN identified the preceding error through a submission to CMS on June 29, 2026, asking that its 2026 Star Rating be recalculated in accordance with the Georgia federal court's second holding.

127.    Specifically, SCAN stated that "upon review, it appears that CMS did not remove all measures subject to the *Clover* decision, specifically, C03, C04, C05, C15, C16, C22, C23, C24, C25, and C27, from SCAN's 2026 Star Rating, which remains unchanged at 4.0 Stars.  As that decision and the underlying briefing correctly explains, these measures' specifications constitute rules, requirements, or other statements of policy that establish a substantive legal standard governing the scope of benefits, the payment for services, and the eligibility of entities or organizations to furnish Medicare services or benefits under 42 U.S.C. § 1395hh(a)(2), because they determine payments to plans, the benefits they offer, and the eligibility of plans to participate in Part D.  They must therefore be subjected to notice and comment rulemaking and published as regulations, which CMS indisputably has not done."

128.    SCAN therefore requested that CMS recalculate SCAN's 2026 Star Rating, as identified in the Health Plan Management System (or "HPMS") under its June 17, 2026 memorandum, with the removal of these ten identified measures, which would result in SCAN's

---

harmless" basis, meaning that CMS would not implement the recalculated rating where it decreased a plan's overall Star Rating.

2026 Star Rating increasing from 4 to 4.5 Stars.  SCAN also noted that it was prepared to submit SCAN's updated 4.5 Star bid, and requested CMS's direction for how to do so at that time.

129.    CMS responded the same day, stating:

Your request to change the terms of the hold harmless is not consistent with the HPMS memo attached and released on June 17th.  In that memo, we stated "We recalculated the 2027 QBP ratings for MA [Medicare Advantage] organizations only using data collected under 42 U.S.C. 1395w-22(e) as of November 1, 2003, specifically Part C measures using Healthcare Effectiveness Data and Information Set (HEDIS), Consumer Assessment of Healthcare Providers and Systems (CAHPS), and Health Outcomes Survey (HOS) data." We held all contracts harmless if the recalculated QBP rating resulted in a lower rating.

## I.    CMS Erred In Determining SCAN's 2026 Star Rating at 4.0 Stars

130.    CMS unlawfully determined SCAN's 2026 Star Rating using the ten unlawfully promulgated measures identified above (C03, C04, C05, C15, C16, C22, C23, C24, C25, and C27). *See supra* ¶¶ 34-37.

131.    In determining SCAN's 2026 Star Rating, CMS utilized measures without adopting those measures' specifications as regulations through required notice-and-comment rulemaking under 42 U.S.C. § 1395hh(a)(2).

132.    Under the Medicare Act, "no rule, requirement, or other statement of policy . . . [that] establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation."  42 U.S.C. § 1395hh(a)(2).

133.    CMS's Star Ratings measures determine CMS's payments to SCAN, SCAN's benefits offered to beneficiaries, SCAN's payments to providers, and SCAN's eligibility to participate in the Medicare Advantage program.  *Id.* §§ 1395w-23(o)(1); 1395w-24(b)(1)(C); 1395w-24(b)(1)(C)(v); 42 C.F.R. §§ 422.260, 422.266(a)(2)(ii); *SCAN*, 2024 WL 2815789, at *1 (highlighting that CMS is "obligated" to "offer additional funding to plans with better Star

Ratings" and "higher-rated plans can then use those extra funds to lower costs for their beneficiaries or to provide them with additional benefits").[11]

134.    In addition, CMS terminates plans that have Part C Star Ratings below three stars for three consecutive years.  *See* 42 C.F.R. § 422.510(a)(4)(xi).

135.    The specification of each of the Star Ratings measures identified herein thus amounts to a "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter." 42 U.S.C. § 1395hh(a)(2); *Allina Health Servs. v. Price*, 863 F.3d 937, 943 (D.C. Cir. 2017) (recognizing that HHS's measures "used to calculate the payment that providers will receive for providing healthcare services to low-income patients" fell under § 1395hh(a)(2)), *aff'd*, 587 U.S. 566 (2019).

136.    Because the specification of each Star Ratings measure sets "the scope of benefits" and "payment for services," and SCAN's "eligibility" to participate in Medicare Advantage, these measures must be promulgated "by regulation."  *See* 42 U.S.C. § 1395hh(a)(2).

137.    Consistent with § 1395hh(a)(2), CMS has codified in the Code of Federal Regulations almost every material aspect of its Star Rating system, including procedures governing how the Star Ratings are calculated.  *See generally* 42 C.F.R. §§ 422.160-166, 423.180-186.

138.    But CMS has chosen to treat the *specification* of *measures* differently, on the theory that publishing measure specifications as regulations in the Code of Federal Regulations would diminish CMS's ability to morph these specifications from year to year.  83 Fed. Reg. at 16,537

---

[11] The Star Ratings also impact SCAN's ability to expand its operations, and the ability to enroll members year-round at the 5-star level.

("CMS will not codify a list of measures and specifications in regulation text in light of the regular updates and revisions contemplated [by CMS].").

139.    The problem with CMS's failure to codify the measures' specifications as regulations through notice and comment rulemaking is that Congress requires CMS to do so.  42 U.S.C. § 1395hh(a)(2) ("No rule, requirement, or other statement of policy (other than a national coverage determination) that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation under paragraph (1).").

140.    CMS did not promulgate "by regulation" *any* of the specifications for the following measures that it applied to SCAN in determining SCAN's 2026 Star Ratings:

- Annual Flu Vaccine (C03),

- Improving or Maintaining Physical Health (C04),

- Improving or Maintaining Mental Health (C05),

- Reducing the Risk of Falling (C15),

- Improving Bladder Control (C16),

- Getting Needed Care (C22),

- Getting Appointments and Care Quickly (C23),

- Customer Service (C24),

- Rating of Health Care Quality (C25),

- Care Coordination (C27)

141.    Moreover, even if CMS were to take the position that promulgating these measures' specifications "by regulation" is met by publishing these measures in the Federal Register, CMS

26

did not do that, either.

142.    To be sure, CMS has listed out the names and high-level descriptions of the measures in prior Federal Register announcements.  But CMS has not provided in the Federal Register the specifications for how the measures are determined.  83 Fed. Reg. at 16,531-32.

143.    To actually determine the Star Ratings measures each year, CMS must use, at minimum, the summary specifications in CMS's Star Ratings Technical Notes, which CMS publishes annually, and potentially also the *detailed* specifications and Technical Notes for *each measure*, found in CMS's sub-regulatory guidance outside of the Star Ratings Technical Notes. *See, e.g.*, CMS, *Medicare Pt. C & D Call Center Monitoring Accuracy & Accessibility Study Tech. Notes* (2022) (specifying calculation of C33 and D01 measures).

144.    So even if publication in the Federal Register sufficed to promulgate a standard "by regulation," CMS has failed to publish within the Federal Register the actual specifications necessary to determine the measures identified above.

145.    As the D.C. Circuit explained, "[t]he real dividing point between regulations and general statements of policy is publication in the Code of Federal Regulations, which the statute authorizes to contain only documents 'having general applicability *and legal effect*,' 44 U.S.C. § 1510 (1982) (emphasis added), and which the governing regulations provide shall contain only 'each Federal regulation of general applicability and current or future effect,' 1 C.F.R. § 8.1 (1986)." *Brock v. Cathedral Bluffs Shale Oil Co*., 796 F.2d 533, 538-39 (D.C. Cir. 1986); *see also Wilderness Soc'y v. Norton*, 434 F.3d 584, 596 (D.C. Cir. 2006) (same).

146.    Accordingly, CMS cannot apply the measures identified above to SCAN because they were not promulgated "by regulation" as required by 42 U.S.C. § 1395hh(a)(2).

27

147.    CMS thus erroneously deprived SCAN (Contract Numbers H5425 and H0976) of a 4.5 Star Rating, instead leaving SCAN with a 4.0 rating based on unlawfully promulgated measures.

148.    Had CMS calculated SCAN's 2026 Star Rating without these ten unlawful measures, SCAN's Star Rating would have improved to 4.5 Stars, entitling SCAN to a higher rebate percentage and approximately $125 million, which would benefit SCAN and its members.

**J.    SCAN Suffers And Will Continue To Suffer Harm From CMS's Unlawful Determination Of Its 2026 Star Rating**

149.    CMS's unlawful determination of SCAN's Star Rating at 4 Stars has harmed and will continue to harm SCAN and its members.

150.    SCAN's Star Rating is a critical factor in determining CMS's payments to SCAN.

151.    A Star Rating of 4.0 Stars leaves SCAN ineligible for increased rebates available for a 4.5 Star plan.  This will result in a direct loss of roughly $125 million in 2027, that SCAN would have been entitled to with a 4.5 Star Rating.

152.    CMS's unlawful determination of SCAN's Star Rating at 4.0 Stars, as well as its determination of the measures identified above at or below 4.0 Stars, has also caused significant harm to SCAN's reputation and goodwill, which will compound if it is left in place.

153.    Star Ratings (both measure-specific and overall) are publicized on CMS's website during the annual open enrollment period, and CMS informs beneficiaries that Star Ratings reflect a plan's quality.

154.    By assigning SCAN a 4.0 Star Rating, and the individual measure ratings discussed above, CMS has erroneously indicated to beneficiaries that SCAN's quality is inferior to that of other competing plans.

**COUNT I: VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT**
**AGENCY ACTION THAT IS WITHOUT OBSERVANCE OF PROCEDURE**
**REQUIRED BY LAW AND NOT IN ACCORDANCE WITH LAW**
**Violation of 5 U.S.C. § 706**

155.   The foregoing paragraphs are incorporated by reference as if set forth in full herein.

156.   The APA prohibits Defendants from acting in any way that is without observance of procedure required by law or not in accordance with law.  5 U.S.C. § 706(2)(A), (C), (D).

157.   Congress has mandated that CMS must engage in notice-and-comment rulemaking and codify "by regulation" any "rule, requirement, or other statement of policy" that "establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under [Medicare]." *Allina*, 587 U.S. at 570 (quoting 42 U.S.C. § 1395hh(a)(2)).

158.   CMS did not engage in notice-and-comment rulemaking and codify "by regulation" in the Code of Federal Regulations several measures and their specifications that it applied to SCAN in determining its 2026 Star Ratings: Annual Flu Vaccine (C03), Improving Physical Health (C04), Improving Mental Health (C05), Reducing Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), and Care Coordination (C27).

159.   Moreover, to the extent that CMS might now claim that it did so, CMS did not comply with its notice and comment requirements in 42 C.F.R. § 422.164(c)(2), (d)(2) either.

160.   The Court should set aside SCAN's unlawful 2026 Star Rating, order CMS to recalculate SCAN's Star Rating without inclusion of these measures, and award any equitable and injunctive relief necessary to afford rebate relief.

**PRAYER FOR RELIEF**

WHEREFORE, SCAN respectfully requests that this Court enter judgment in its favor and grant the following relief:

i)   A declaration pursuant to 28 U.S.C. § 2201 that the use of the following measures to determine SCAN's 2026 Star Rating was unlawful and in violation of the APA: Annual Flu Vaccine (C03), Improving or Maintaining Physical Health (C04), Improving or Maintaining Mental Health (C05), Reducing the Risk of Falling (C15), Improving Bladder Control (C16), Getting Needed Care (C22), Getting Appointments and Care Quickly (C23), Customer Service (C24), Rating of Health Care Quality (C25), and Care Coordination (C27).

ii)  An order setting aside and vacating SCAN's 2026 Star Rating.

iii) An order directing CMS to recalculate SCAN's 2026 Star Rating.

iv)  An order directing CMS to determine SCAN's 2026 Star Rating as 4.5 Stars.

v)   An injunction providing for rebate relief, including an order requiring CMS to facilitate any modified bid documents necessary to effectuate the judgment.

vi)  An order awarding SCAN its costs and attorneys' fees and expenses as allowed by law.

vii) Such other and further relief as the Court deems just and proper.

Dated: July 31, 2026

Respectfully submitted,

*/s/ Andrew D. Prins*

Andrew D. Prins
D.C. Bar No. 998490
Rachael L. Westmoreland
D.C. Bar No. 90034032
Dorothy M. Canevari
D.C. Bar No. 90043751
Halle H. Edwards
D.C. Bar No. 1780113
LATHAM & WATKINS LLP
555 Eleventh Street NW, Suite 1000
Washington, DC 20004
Tel: (202) 637-2200
Fax: (202) 637-2201
Email: andrew.prins@lw.com
  rachael.westmoreland@lw.com
  dolly.canevari@lw.com
  halle.edwards@lw.com

Nicholas L. Schlossman
D.C. Bar No. 1029362
LATHAM & WATKINS LLP
300 Colorado Street, Suite 2400
Austin, TX 78701
Tel: (737) 910-7300
Fax: (737) 910-7301
Email: nicholas.schlossman@lw.com

*Attorneys for Plaintiff SCAN Health Plan*

31