UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SCAN HEALTH PLAN,<br><br>Plaintiff,<br><br>v.<br><br>DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*,<br><br>Defendants. | Civil Action No. 26-2391 (CRC) |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

## TABLE OF CONTENTS

Table of Contents ..................... i

Table of Authorities ..................... ii

Argument ..................... 3

I. SCAN's Claims as to Contract H0976 Should be Dismissed for Lack of Subject-Matter Jurisdiction. ..................... 3

II. The Medicare Advantage Star Ratings Measure Specifications Do Not Violate the Medicare Statute's Rulemaking Provision..................... 6

A. Star Ratings measure specifications do not govern the payment for services..................... 6

B. Star Ratings measure specifications do not govern eligibility to furnish services or benefits..................... 18

C. Star Ratings measure specifications do not govern the scope of benefits. 21

III. Any Relief Should be Appropriately Limited..................... 22

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alignment Healthcare Inc. v. HHS*,
181 F.4th 1 (D.C. Cir. 2026) .... 9

*Brown v. Gardner*,
513 U.S. 115 (1994) .... 11

*City & Cnty. of San Francisco, California v. EPA*,
604 U.S. 334 (2025) .... 12

Clover Ins. Co. v. HHS,
No. 2:25-CV-142, 2026 WL 1483515 (S.D. Ga. May 27, 2026) .... 24

*Elevance Health, Inc. v. Becerra*,
736 F. Supp. 3d 1 (D.D.C. 2024) .... 24

*Elevance Health, Inc. v. HHS*,
No. 2:26-cv-61, 2026 WL 2531796 (S.D. Ga. Aug. 27, 2026) .... 3

*Epic Sys. Corp. v. Lewis*,
584 U.S. 497 (2018) .... 9

*FDA v. Wages and White Lion Invs.*,
604 U.S. 542 (2025) .... 24

*FTC v. Mandel Brothers, Inc.*,
359 U.S. 385 (1959) .... 9

*Genus Lifesciences, Inc. v. Azar*,
486 F. Supp. 3d 450 (D.D.C. 2020) .... 11

*Gustafson v. Alloyd Co.*,
513 U.S. 561 (1995) .... 9

*HMO Louisiana, Inc. v. HHS*,
179 F.4th 62 (D.C. Cir. 2026) .... 20

*Humana*,
806 F. Supp. 3d. .... 16, 18, 19, 20

*In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation*,
751 F.3d 629 (D.C. Cir. 2014) .... 24, 25

*PPG Indus., Inc. v. United States*,
52 F.3d 363 (D.C. Cir. 1995) .... 24, 25

*SEC v. Chenery*,
318 U.S. 80 (1943) .... 24

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .... 3

*UnitedHealthcare Ins. Co. v. Becerra*,
16 F.4th (D.C. Cir. 2021) .... 14, 15

*Utility Air Regulatory Group v. EPA*,
573 U.S. 302 (2014) .... 12

**Statutes**

5 U.S.C. § 706(2)(A) .... 23

5 U.S.C. § 706(1) .... 25
42 U.S.C. § 1395k(a) .... 8
42 U.S.C. § 1395w-21(i)(2) .... 10, 11
42 U.S.C. § 1395w-22(a)(3) .... 21
42 U.S.C. § 1395x(a) .... 8
42 U.S.C. § 1395x(u) .... 12
42 U.S.C. § 1395hh(a)(2) .... *passim*
42 U.S.C. §§ 1395x(b)(3) .... 11

**<u>Regulations and Other Authorities</u>**

42 C.F.R. 422.266(b) .... 17, 18
42 C.F.R. § 400.202 .... 8, 12, 18
42 C.F.R. § 422.254(b)(3) .... 18
42 C.F.R. § 422.260(b)(i) .... 17
42 C.F.R. § 422.256(a)(2) .... 13
42 C.F.R. §§ 422.508 .... 20
83 Fed. Reg. 16,440 (Apr. 16, 2018). .... 17
88 Fed. Reg. 6,643 (Feb. 1, 2023) .... 14

## INTRODUCTION

SCAN presses three theories supporting its contention that, under 42 U.S.C. § 1395hh(a)(2), CMS was required to promulgate the Star Ratings measure specifications by regulation: they govern "payment for services," "eligibility to furnish services or benefits," and "the scope of benefits." None has merit.

The Star Ratings measure specifications do not "govern[] . . . payment for services" within the meaning of § 1395hh(a)(2) because the government pays Medicare Advantage organizations for providing benefits as part of insurance coverage, not services. "Services" as used in the Medicare statute predominantly refers to medical care, not benefits. The government pays Medicare Advantage insurers to provide insurance coverage to beneficiaries, not for the services furnished by healthcare providers to beneficiaries as CMS does in administering original Medicare. Even if benefits Medicare Advantage insurers offered qualified as "services," the Star Ratings measure specifications do not "govern" payment for providing these benefits. The Star Ratings measure specifications do not control legal procedure or act as a rule, precedent, law, or deciding principle for payment, much less "payment for services."

The Star Ratings measure specifications do not "govern[] . . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits." The technical specifications that CMS uses to calculate Star Ratings measures, which in turn affect Medicare Advantage organizations' entitlement to quality bonus payments each year, do not have decisive influence or control over a Medicare Advantage organization's eligibility to furnish benefits. CMS's comprehensive termination regulations provide the deciding principle for termination.

The Star Ratings do not "govern[] . . . the scope of benefits" because Medicare Advantage organizations may choose to offer supplemental benefits to beneficiaries without regard to their

Star Ratings. CMS's regulations concerning supplemental benefits provide legal standards that constrain the scope of benefits that plans may offer. The Star Ratings measure specifications do not similarly control legal procedure or act as a rule, precedent, law, or deciding principle for the scope of benefits plans determine to offer.

There is no permutation of measures that would increase contract H0976's Star Rating to 4.5 Stars and consequently, SCAN has not met its burden of establishing standing. Following a remand, CMS would recalculate the 2026 Star Ratings using CMS's bespoke, made-for-SCAN Categorical Adjustment Index ("CAI"), reward factor, and improvement measures using standard calculation methodology. CMS's regulations require a comparison of all contracts' data for calculation of the improvement measure stars—specifically, calculation of improvement measure cut points—the CAI, and reward factor. SCAN's preferred methodology would only partially remove the measures it objects to from calculation of their Star Ratings.

Finally, if the Court disagrees with CMS on the merits, it should not enter a detailed remand order requiring CMS to facilitate the resubmission of any bid documents. CMS has no obligation to delineate the necessary operational steps to ultimately provide for rebate relief following a judgment in SCAN's favor when entitlement to relief is purely hypothetical. Failure to provide assurances about how an agency might operationalize a decision favorable to a plaintiff to that plaintiff's satisfaction is not a basis for a plaintiff to request entry of a detailed remand order beyond what the APA provides. Remand without detailed instructions is especially appropriate here so that CMS can consider whether taking further action consistent with the corrected legal standards requires it to exclude all measures used to calculate SCAN's Star Ratings on the basis that none of them were promulgated through notice-and-comment rulemaking.

## ARGUMENT

### I. SCAN's Claims as to Contract H0976 Should be Dismissed for Lack of Subject-Matter Jurisdiction.

SCAN's theories of harm flow from its mistaken hypothesis that, if CMS calculates its contracts' 2026 Star Ratings by excluding the ten measures subject to the *Clover* court's notice-and-comment conclusion, its 2026 Star Rating for contract H0976 will increase. Specifically, SCAN contends that it "would have received overall 2026 Star Ratings of 4.5 stars, rather than 4 stars, and would have been eligible for an approximate $125 million in additional rebates for the 2027 plan year." Plaintiff's Memo. in Support of Mot. Summ. J. ("Pl.'s Br.") at 3. As "the party invoking federal jurisdiction," SCAN "bears the burden of establishing" standing. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). SCAN must only show that there is a plausible permutation of measures that would increase contract H0976's Star Rating to 4.5 Stars. SCAN cannot meet this standard. There is simply no permutation of measures that would increase contract H0976's Star Rating to 4.5 Stars as CMS's calculations show. Defendants' Memo. in Support of Cross-motion for Summary Judgment ("Defs.' Br."), Ex. 1, Goldstein Declaration ("Goldstein Dec.") ¶ 5.

CMS is not asking this Court to "'precisely predict how the 2026 Star Rating would be calculated if [SCAN] succeed[s] on [its] claim.'" Plaintiff's Opposition to Defendants' Cross-Motion for Summary Judgment and Reply ("Pl.'s Opp.") at 9 (quoting *Elevance Health, Inc. v. HHS*, No. 2:26-cv-61, 2026 WL 2531796, at *7 (S.D. Ga. Aug. 27, 2026)). SCAN must only show that there is a plausible permutation of measures that would increase contract H0976's Star Rating to 4.5 Stars, consistent with the relief it has requested. It cannot do so.

SCAN describes CMS's preview of its calculations eliminating the ten challenged measures for contract H0976 as "speculative possibilities of what the agency might do on remand." Pl.'s Opp. 8. This is wrong. Following a remand, CMS would in fact recalculate the 2026 Star

Ratings in the matter set forth in Dr. Goldstein's declaration, namely, using CMS's bespoke, made-for-SCAN CAI, reward factor, and improvement measures using standard calculation methodology. Ex. 1, Second Goldstein Declaration ("Second Goldstein Dec.") ¶ 5. Under this recalculation methodology, contract H0976 would remain at four stars.

Whenever CMS is required to exclude measures for a given contract, it must undertake a full recalculation that requires re-running data for all contracts as if the challenged measures had been completely removed from the program if there is any uncertainty about its ultimate score. *Id.* This is because calculation of the improvement measure stars—specifically, calculation of improvement measures cut points—the CAI, and reward factor, require a comparison of all contracts' data. *Id.* at ¶¶ 6-7. The relevant measures, here, the ten challenged measures, must therefore be removed for all contracts even if the overall rating is only updated for the contract at issue. *Id.* ¶ 5. This full recalculation entails comparing the contract at issue with all other contracts with the same measures removed from all contracts in the recalculation, re-running the improvement measure cut points, recalculating the improvement measures, and recalculating the reward factor and Categorical Adjustment Index with the smaller set of measures. *Id.* ¶ 11.

For CMS not to undertake a full recalculation of Star Ratings for all contracts as if the challenged measures were removed from the program entirely would create an incoherent, incorrect Star Rating. Under SCAN's approach, the new cut points used to determine SCAN's new improvement measure without the challenged measures, for instance, would bear no mathematical relation to the old cut points generated with the ten challenged measures. *Id.* at ¶¶ 3-6. Additionally, 42 C.F.R. § 422.166(f)(1)(i) requires that, to apply the reward factor, a "contract's performance will be assessed using its weighted mean and its ranking relative to all rated contracts in the rating level." It would therefore be impossible to perform the necessary

calculations unless all contracts in the calculation used identical measures. Similarly, calculating the CAI requires an apples-to-apples comparison across contracts; it is not possible to derive a CAI when comparing contracts that are rated on different measures. *Id.* at ¶ 9.

SCAN rejects the notion that CMS's regulation and mathematical coherence require CMS to undertake a full recalculation of Star Ratings for all contracts without the challenged measures. Pl.'s Opp. 11. Instead, the Star Ratings calculation methodology SCAN prefers is one in which the ten measures it challenges are only *partially* removed from the recalculation of its Star Ratings. Without any explanation, SCAN would not remove those ten measures for purposes of calculating the improvement measures cut points, CAI, and reward factor. While SCAN argues that CMS's regulations provide for "one, actual CAI and reward factor scale for all plans, namely the one that CMS already developed and applied to all plans back in October 2025," *id.*, SCAN misreads CMS's regulations. As established, § 422.166(f)(1)(i) requires that, to apply the reward factor, a "contract's performance will be assessed using its weighted mean and its ranking *relative to all rated contracts in the rating level*." 42 C.F.R. § 422.166(f)(1)(i) (emphasis added). Such a relative ranking requires CMS to compare a contract's performance on an apples-to-apples basis, which is the process CMS follows—and will follow if required to recalculate SCAN's Star Rating. SCAN provides no explanation as to why CMS should ignore this regulatory requirement and recalculate its Star Ratings excluding measure scores for the challenged measures but by utilizing improvement measure cut points, CAI, and a reward factor relying on those same measures.

In sum, under CMS's recalculation methodology, contract H0976 would remain at four stars. SCAN accordingly lacks standing to pursue its claims with regard to it.

## II. The Medicare Advantage Star Ratings Measure Specifications Do Not Violate the Medicare Statute's Rulemaking Provision.

SCAN contends that CMS's method of determining the amount of its quality bonus payments through Star Ratings measure specifications violates the Medicare statute because those specifications were not established "by regulation." There is no legal basis for this claim, which (if this Court adopts it) would undermine all the existing Star Ratings measure specifications that underly all quality bonus payments to all Medicare Advantage organizations.

While the Medicare statute requires that CMS effectuate certain agency actions "by regulation," 42 U.S.C. § 1395hh(a)(2), this requirement does not apply to Star Ratings measure specifications. The Medicare rulemaking provision states:

> No rule, requirement, or other statement of policy . . . that establishes or changes a substantive legal standard governing the scope of benefits, the payment for services, or the eligibility of individuals, entities, or organizations to furnish or receive services or benefits under this subchapter shall take effect unless it is promulgated by the Secretary by regulation.

42 U.S.C. § 1395hh(a)(2).

SCAN presses three theories for why CMS was required to promulgate the Star Ratings measure specifications by regulation, arguing in turn that they govern "payment for services," "eligibility to furnish services or benefits," and "the scope of benefits." Pl.'s Br. at 23-29. None has merit.

### A. Star Ratings measure specifications do not govern the payment for services.

The Star Ratings measure specifications do not "govern[] . . . payment for services" within the meaning of § 1395hh(a)(2) for two reasons. First, the government pays Medicare Advantage organizations for providing benefits as part of insurance coverage, not services. Second, even if benefits Medicare Advantage insurers offered qualified as "services," the Star Ratings measure specifications do not govern payment for providing these benefits. For the Star Ratings measure

specifications to "govern[] payment for services" under § 1395hh(a)(2), both conditions must be satisfied.

**1. Benefits the government pays Medicare Advantage organizations for providing benefits as part of insurance coverage, not services.**

The government made clear in its opening brief that when the Medicare statute refers to "payment for services," it refers to the amounts CMS, acting as an insurer, pays to providers of medical services in exchange for furnishing medical care for beneficiaries, not what it pays Medicare Advantage organizations like SCAN to provide insurance benefits to Medicare beneficiaries. SCAN does not even attempt to refute the government's showing that the word "services" as used in the Medicare statute predominantly refers to medical care. *See* Defs.' Br. at 14-15. And SCAN buries in a footnote its response to the Secretary's showing that the Medicare statute's definitions of the "scope of benefits" under parts A and B means a beneficiary's "entitlement to have payment made to him or on his behalf" for "services." *See* Pl.'s Opp. at 21 n.6. SCAN further fails to explain its extraordinary contention that "services under Parts A and B" are somehow "unrelated to Part C." *Id.* The first provision delineating the "basic benefits" covered "under" Medicare Advantage plans directs that "each [Medicare Advantage] plan shall provide to members . . . benefits under the original Medicare fee-for-service program option," which are defined as "those items and services . . . for which benefits are available under parts A and B." *Id.* at §§ 1395w-22(a)(1)(A), (a)(1)(B)(i). The entire point of Medicare Advantage is that the government pays Medicare Advantage insurers to provide insurance coverage to beneficiaries (just as CMS does in administering original Medicare), not for the services furnished by healthcare providers to beneficiaries.

Instead of responding to the clear textual indicators that "services" in the Medicare Act means "medical services," SCAN spends most of its brief trying to muddy the waters by plucking

isolated text and phrases from throughout the Medicare statute. The language of the Medicare statute makes clear, however, that CMS pays Medicare Advantage insurers for providing benefits (meaning insurance coverage), not Medicare "services." As SCAN recognizes, Congress in § 1395x defined "dozens of sub-types of 'services,' such as 'nursing services' and 'surgical services,'" Pl.'s Opp. 21, but somehow neglected to include insurance. This is not a plausible reading of the Medicare statute. The applicable regulation states: "Services means medical care or services and items, such as medical diagnosis and treatment, drugs and biologicals, supplies, appliances, and equipment, medical social services, and use of hospital, [critical access hospitals], or [skilled nursing] facilities." 42 C.F.R. § 400.202. The court should reject SCAN's contention because the plain text of the Medicare statute flatly contradict it.

The Medicare statute treats benefits as distinct from services. "Benefits" are provided to an individual by an insurer and consist of "entitlement to have payment made to him or on his behalf . . . for medical and other health services." 42 U.S.C. § 1395k(a) (delineating the scope of benefits for Part B beneficiaries); *see also* § 1395d(a) (delineating the scope of benefits for Part A beneficiaries). A "[Medicare Advantage] eligible individual" means "an individual who is entitled to benefits under part A and enrolled under part B." § 1395w-21(a)(3). Under the Medicare statute, a benefit is the promise of coverage for the cost of medical services that is guaranteed to Medicare beneficiaries; a service is the underlying treatment. *See, e.g.*, 42 U.S.C. § 1395x(a) (referring to access to "hospital services" or "extended care services"); § 1395x(b) (referring to "services furnished to an inpatient of a hospital"); § 1395x(k) (referring to "services furnished by" a hospital or nursing facility). SCAN contends that "'items and services under the plan' are defined as coextensive with the 'benefits' for which the plan provides coverage." Pl.'s Opp. 17. Because "benefits," which are beneficiaries' entitlements, are different in kind from "services," which

refers to medical care, SCAN's theory that they are somehow equivalent is incoherent and otherwise unsupported by the Medicare statute. *See Gustafson v. Alloyd Co.*, 513 U.S. 561, 569 (1995) (courts must read statutes "as a symmetrical and coherent regulatory scheme"); *see also Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 511 (2018) ("Our rules aiming for harmony over conflict in statutory interpretation grow from an appreciation that it's the job of Congress by legislation, not this Court by supposition, both to write the laws and to repeal them."); *FTC v. Mandel Brothers, Inc.*, 359 U.S. 385, 389 (1959) (courts must "fit, if possible, all parts [of statute] into a harmonious whole").

SCAN asserts that "plans provide services in exchange for fixed monthly payments from CMS," Pl.'s Opp. 15, and that the "services" plans provide in exchange for payment are those services underlying the benefits that plans offer, *id.* at 17. This is incorrect. Under Medicare Advantage, CMS does not pay Medicare Advantage organizations for providing healthcare services; payments from CMS to plans are payments to compensate plans for providing benefits and coverage. *See Alignment Healthcare Inc. v. HHS*, 181 F.4th 1, 236 (D.C. Cir. 2026) (explaining that "Medicare Part C allows beneficiaries to receive health insurance through private Medicare Advantage plans administered by private health insurers, which contract with CMS to provide coverage" and that monthly payments to insurance providers are for "provid[ing] coverage for each beneficiary"). The Medicare statute makes this clear: "the Secretary shall make monthly payments under this section . . . to each [Medicare Advantage] organization, with respect to *coverage* of an individual." 42 U.S.C. § 1395w-23(a)(1)(A) (emphasis added). And the Medicare statute requires Medicare Advantage organizations to provide benefits. *Id.* § 1395w-22(a)(1)(A). The Medicare statute also makes clear that monthly aggregate bid amounts are premised on "the provisions of benefits under the original [Medicare] fee-for service program," "the provision of

basic prescription drug coverage," and "the provision of supplemental health care benefits." *Id.* § 1395w-24(a)(6)(A)(ii)(I)-(III). Consequently, the bids Medicare Advantage organizations submit are premised not on provision of medical services, but on provision of benefits and coverage.

SCAN fails to cite statutory language supporting its reading. SCAN points to language in the Medicare statute stating that "only [Medicare Advantage] organizations shall be entitled to receive payments from the Secretary under this subchapter for services furnished to the individual." 42 U.S.C. § 1395w-21(i)(2). SCAN reads this provision as establishing that plans "'receive payments from the Secretary' in exchange for 'services furnished' *from plans to beneficiaries*," even though the statute simply says "services furnished to the individual." Pl.'s Opp. 16 (quoting § 1395w-21(i)(2) (emphasis added). This is a clear misreading of the statute. Medicare Advantage organizations are entitled to receive payments as compensation for providing coverage of medical services. While Medicare Advantage organizations provide insurance coverage to beneficiaries, the statute's reference to "services furnished" refers to medical services furnished by healthcare providers to beneficiaries. This section does not establish that the benefits Medicare Advantage organizations provide are themselves "services" under Medicare. The preceding statutory subsection, § 1395w-21(i)(1), establishes that "payments under a contract with a [Medicare Advantage] organization . . . shall be instead the amounts which (in the absence of a contract) would otherwise be payable under Parts A and B for items and services furnished to the individual." Furnished items and services payable under Parts A and B are not furnished services "from plans to beneficiaries" as SCAN contends, Pl.'s. Opp. 16—they are medical items and services like the kind the government pays directly for under traditional Medicare. Thus, the phrase "for services furnished to the individual" in the preceding provision, § 1395w-21(i)(2), refers to those same services.

Congress's use of the word "furnished" further confirms that § 1395w-21(i)(2) is meant to refer to medical services supplied by healthcare providers and suppliers to beneficiaries. Congress employed the word "furnish" in § 1395x 197 times, exclusively referring to items and services provided by healthcare providers like hospitals, institutions, facilities, physicians, nurses, and other clinicians. *See, e.g.* 42 U.S.C. §§ 1395x(b)(3) ("diagnostic or therapeutic items or services, furnished by the hospital"); 1395x(c) ("term 'inpatient psychiatric hospital services' means inpatient hospital services furnished to an inpatient of a psychiatric hospital"); 1395x(m) ("term 'home health services' means . . . items and services furnished to an individual, who is under the care of a physician, a nurse practitioner or a clinical nurse specialist"); *see also* 1395w-21(c)(4)(A)(vi)(II) ("the applicable MA plan during such period, pays such providers of services and suppliers for items and services furnished to the enrollee . . ."). Under the presumption of consistent usage canon, "[a] word or phrase is presumed to bear the same meaning throughout a text." *Genus Lifesciences, Inc. v. Azar*, 486 F. Supp. 3d 450, 460 (D.D.C. 2020). In § 1395w-21(i)(2), consistent with the other provisions of the Medicare statute, the phrase "furnished service" refers to medical services provided by providers. *See Brown v. Gardner*, 513 U.S. 115, 118 (1994) ("there is a presumption that a given term is used to mean the same thing throughout a statute"). Contrary to SCAN's assertion, Pl.'s. Opp. 17, the statute does not view plans as providing services, medical or otherwise.

SCAN contends that the Medicare statute refers to Medicare Advantage plans as providers of health care services in one provision: "Coordinated care plans . . . provide health care services," citing 42 U.S.C. § 1395w-21(a)(2)(A)(i). Pl.'s Opp. 15-16. In this instance and in context, the word "provide" means to finance or pay for. "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall

statutory scheme.'" *City & Cnty. of San Francisco, California v. EPA*, 604 U.S. 334, 350 (2025) (quoting *Utility Air Regulatory Group v. EPA*, 573 U.S. 302, 320 (2014)). Taking into account the "broader statutory scheme," *id.*, it becomes clear that the providers of "health care services" are not Medicare Advantage insurers, but "hospital[s], critical access hospital[s], rural emergency hospital[s], skilled nursing facility[ies], comprehensive outpatient rehabilitation facility[ies], home health agenc[ies], hospice programs[s]." 42 U.S.C. § 1395x(u). No reasonable person would describe Medicare Advantage insurers as providers of "services" like chemotherapy, dialysis, skilled nursing care, clinical diagnostic laboratory tests, drugs, *see* § 1395w-22(a)(B)(i), except as a payor. And even if plans like SCAN could be described as providers of health care services, § 1395w-21(a)(2)(A)(i) does not discuss CMS payments at all, nor does it demonstrate that CMS payments are for anything but SCAN's provision of benefits and insurance coverage to Medicare beneficiaries.

CMS's regulations further support that benefits provided by Medicare Advantage insurers are distinct from services furnished by healthcare providers. Regulations describe "basic benefits" as "all items and services . . . for which benefits are available under Parts A and B." 42 C.F.R. § 422.100(c)(1). Services are not benefits: "[s]ervices means medical care or services and items, such as medical diagnosis and treatment, drugs and biologicals, supplies, appliances, and equipment, medical social services, and use of hospital, [critical access hospitals], or [skilled nursing] facilities." *Id.* § 400.202. By contrast, benefits are "payment to or on behalf of an entitled individual for services covered." *See id.* (defining supplementary medical insurance benefits). The regulations utilize the phrase "benefits for services furnished," § 422.100(b)(2) because, contrary to SCAN's assertion, Pl.'s Opp. at 18, services and benefits are treated as distinct concepts by CMS.

Contrary to SCAN's contention, an interpretation of "payment for services" as limited to payments to healthcare providers for medical services does not amount to "import[ation of] the payment structure of *traditional* Medicare into Medicare Advantage." Pl.'s Opp. 15. If anything, the Medicare statute imports the structure of traditional Medicare into Medicare Advantage by putting Medicare Advantage organizations into the shoes of CMS. That the payment structure of Medicare Advantage differs from traditional Medicare cuts in the opposite direction—the entire point of Medicare Advantage is that the government pays Medicare Advantage insurers to provide coverage to beneficiaries, not for the services furnished by healthcare providers to beneficiaries as CMS does in administering original Medicare. The promise of Medicare Advantage is that a plan that covers all of a beneficiary's healthcare services at least as well as traditional Medicare but does so at lower cost may pocket the difference. SCAN's theory of payment as related to services furnished is at odds with the purpose of the Medicare Advantage program, which intended to replace traditional fee-for-service Medicare and separate payment to Medicare Advantage organizations from payment for medical services. It is also in tension with the Medicare statute's prohibition on CMS's involvement in plans' contracts with healthcare providers for furnishing items and services to beneficiaries. 42 U.S.C. § 1395w-24(a)(6)(B)(iii) ("the Secretary may not require any MA organization to contract with a particular hospital, physician, or other entity or individual to furnish items and services under this subchapter or require a particular price structure for payment under such a contract"); *see also* 42 C.F.R. § 422.256(a)(2).

SCAN's contention that its argument that plans are entities that furnish services "makes sense in the broader statutory framework," Pl.'s Opp. 16, is thus mistaken. CMS payments to Medicare Advantage organizations are not directly related to the services provided. CMS pays Medicare Advantage organizations prospectively, before any services are furnished to any

beneficiaries. And payments are made as "a monthly lump sum . . . for every beneficiary that they enroll, without regard to the services that the beneficiaries will actually receive." *UnitedHealthcare Ins. Co. v. Becerra*, 16 F.4th 867, 872 (D.C. Cir. 2021).

The purpose of Medicare Advantage was to delink payment with provision of services by medical providers. CMS's monthly payments to a Medicare Advantage organization for a particular beneficiary are intended to reflect the amount CMS would otherwise spend in traditional Medicare for a beneficiary with the same health status and demographic factors—proxies for cost that are distinct from actual service cost. Specifically, the statute directs the Secretary to "adjust the payment amount . . . for such risk factors as age, disability status, gender, institutional status, and such other factors as the Secretary determines to be appropriate, . . . so as to ensure actuarial equivalence." 42 U.S.C. § 1395w-23(a)(1)(C). These adjustments are intended to ensure that Medicare Advantage plans "are paid appropriately for their plan enrollees (that is, less for healthier enrollees who are expected to incur lower health care costs, and more for less healthy enrollees who are expected to incur higher health care costs)." 88 Fed. Reg. 6,643, 6,644 (Feb. 1, 2023). The alternative payment structure of Medicare Advantage, focused on forecasting cost based on health risk and not actual costs incurred by plans for medical services, belies SCAN's claim that CMS pays Medicare Advantage organizations for medical services. SCAN observes that "[i]f healthcare costs *more* than plans expected to bid, plans *lose money* and have no recourse to the government," Pl.'s Opp. 16, but the converse is also true—this is the nature of insurance. That CMS pays for healthcare coverage and not for actual services provided to beneficiaries is meant to benefit Medicare Advantage insurers: "The core idea is that a Medicare Advantage insurer that covers all of a beneficiary's health care at least as well as traditional Medicare but does so at lower cost may pocket the difference as earned revenue, or pass along that revenue to beneficiaries in the

form of extra benefits meant to entice and retain subscribers." *UnitedHealthcare*, 16 F.4th at 867-73. SCAN repeatedly emphasizes that "Congress structured Medicare Advantage differently" from traditional fee-for-service Medicare. *See, e.g.*, Pl.'s Opp. 15. Congress's separation of CMS's payment to Medicare Advantage organizations from the services these insurers finance, however, supports that "payment for services" means only payments to providers for medical services, not payments to Medicare Advantage insurers.

SCAN asserts that "[t]here is . . . a direct line from the Star Ratings measure specifications to the amount CMS pays Medicare Advantage plans: The specifications determine a plan's Star Rating, and the Star Ratings determines the benchmark and rebate percentages used to determine the plan's payment." Pl.'s. Opp. 15. But the "amount CMS pays Medicare Advantage plans" is overwhelmingly dictated by the risk-adjusted monthly payments to plans, not Star Ratings-related quality bonus payments. The Star Ratings—not to mention the Star Ratings measure specifications—have very little to do with the estimated $590.9 billion of government payments to Medicare Advantage organizations in 2026, of which the quality bonus payments account for about $13 billion. *See* CMS, 2026 Medicare Advantage and Part D Advance Notice Fact Sheet, Jan. 10, 2025, https://perma.cc/MTG8-U3XA; MedPAC, *Report to the Congress: Medicare Payment Policy* 409 (March 2026), *available at* https://perma.cc/Z39N-9CWL. The line between Star Ratings technical specifications and what plans ultimately pay for services is attenuated at best.

**2. The Star Ratings Measure Specifications Do Not Govern Payment for Providing Benefits.**

Even if CMS's payments to Medicare Advantage insurers for providing insurance benefits could somehow be described as "payment for services," the technical specifications for the quality measures used to determine Star Ratings which affect quality bonus payments do not "govern"

payment for services. *See* 42 U.S.C. § 1395hh(a)(2). As addressed in the government's opening brief, CMS's Star Ratings measure specifications have nothing to do with the amount providers of medical services are paid for covered services under Medicare. Defs.' Br. 14-19. A Medicare Advantage organization's Star Ratings are wholly independent from its obligation to provide insurance benefits for Medicare-covered services on behalf of Medicare beneficiaries. *See id.* at §§ 1395w-22(a)(1)(A), (a)(1)(B)(i).

To "'govern' means 'to prevail or have decisive influence; control.'" *Humana Inc. v. HHS*, 806 F. Supp. 3d. 642, 648 (N.D. Tex. 2025) (citing Merriam Webster), *appeal docketed,* No. 25-11302 (5th Cir.); *see also Govern*, Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue"). SCAN relies on alternative definitions of "govern," almost none of which were published in this century. Pl.'s Opp. 26. "Governing," SCAN contends, "clearly refers to a legal standard that 'control[s] legal procedure for (an action, practice, process, etc.),' for example, in the phrase 'laws that govern the sale of alcohol.'" *Id.* (quoting *Govern*, Webster's Dictionary Online) (listing similar definitions). But even under SCAN's alternative definitions, its theory fails. The Star Ratings measure specifications do not "control legal procedure," or act as "a rule, precedent, law, or deciding principle for," *id.*, "payment for services." SCAN asserts that "'governing'" means "providing standards for a given subject," *id.* at 28, but neglects to explain how the measure specifications establish any standards related to payment for services. The Star Ratings measure specifications do not in and of themselves contemplate payment, let alone payment for services.

SCAN asserts that "the core point of tying payments to Star Ratings was to incentivize plans to offer high quality core traditional Medicare (Parts A and B) services to increase payments from the same basket of core services." Pl.'s Opp. 19. This is not quite right. The Star Ratings-

related quality bonus payments are aimed at evaluating a Medicare Advantage insurer's "demonstrated quality of its Medicare contract operations." 42 C.F.R. § 422.260(b)(i), (b)(ii). The purpose of the Star Ratings system is to provide a "true reflection of plan quality and enrollee experience" and "reflect the prevalence of conditions and the importance of health outcomes in the Medicare population." *See* Contract Year 2019 Policy & Technical Changes to the Medicare Advantage Program, 83 Fed. Reg. 16,440, 16,521 (Apr. 16, 2018). Provision of quality services by health care providers is therefore incidental to the primary goals of evaluating both a Medicare Advantage insurer's provision of benefits that are essential to contract operation, insurance coverage, and healthcare outcomes. While health outcomes are certainly related to quality healthcare items and services, the core idea of Medicare Advantage is that an insurer could maintain or improve health outcomes at a lower cost by providing *fewer* overall traditional Medicare services, potentially by investing in preventive services like cancer screenings or innovative programs.

Further, the quality bonus payments unlocked by certain Star Ratings are flat, monthly amounts that do not turn on what medical services a beneficiary actually receives in a given month or how much the Medicare Advantage organization pays for those services. 42 U.S.C. § 1395w-23(a)(1)(B)(i). A plan's obligation to pay for services on behalf of beneficiaries exists whether or not it receives quality bonus payments. And the Medicare statute and regulations forbid Medicare Advantage organizations from using quality bonus payments to pay for Medicare-covered services. 42 U.S.C. § 1395w-24(b)(1)(C)(i); 42 C.F.R. 422.266(b). Plans may use quality bonus payments only to pay for supplemental benefits—like additional categories of care beyond what is ordinarily covered by Medicare or reductions in beneficiary cost sharing—or reduce beneficiary premiums. 42 C.F.R. § 422.266(b). SCAN claims that supplemental benefits they provide are in

fact services, Pl.'s Opp. 19, but as established, the supplemental benefits they provide by virtue of quality bonus payments are only "payment[s] to or on behalf of an entitled individual for services covered," not the provision of medical services themselves. *See id.* § 400.202 (defining supplementary medical insurance benefits). As a result, the technical specifications used to calculate the measures that determine Star Ratings, which in turn affect quality bonus payments that can only be used for these supplementary insurance benefits, cannot "govern" payment for services under § 1395hh.

Finally, SCAN hypothesizes that, as an alternative to receiving rebates that cannot be used to finance coverage of Medicare services, Medicare Advantage organizations can raise their bids to receive higher compensation for paying for Medicare Parts A and B benefits.[1] Pl.'s Opp. 20 n.4. But the amount of a Medicare Advantage insurer's bid is entirely within its discretion and cannot be used to show that the technical specifications underlying Star Ratings-related quality bonus payments "govern[]" a Medicare Advantage insurer's payments to healthcare providers. *Humana Inc.*, 806 F. Supp. 3d at 648 (to "'govern' means 'to prevail or have decisive influence; control.'" (citing Merriam Webster)); *see also* Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue"). For the foregoing reasons, Star Rating measure specifications are not subject to the rulemaking requirements of § 1395hh.

### B. Star Ratings measure specifications do not govern eligibility to furnish services or benefits.

The Star Ratings measure specifications do not "govern[] . . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits." 42 U.S.C. § 1395hh(a)(2). SCAN argues that

---

[1] This does not square with CMS's regulations. A plan's bid must be prepared on an actuarial basis reflecting the plan's "revenue requirements" to provide benefits, and CMS may accept a bid only if it "reasonably and equitably reflects the revenue requirements . . . of benefits provided under that plan." 42 U.S.C. §§ 1395w-24(a)(6)(A), (B)(ii); 42 C.F.R. § 422.254(b)(3).

the measures and data that contribute to Star Ratings "govern" a Medicare Advantage organization's "eligibility . . . to furnish . . . benefits" because regulations provide that CMS may terminate a plan if it receives a Star Rating of less than three stars for three consecutive years. *See* 42 C.F.R. § 422.510(a)(4)(xi). As explained *supra* § II.A.2., SCAN's position is incompatible with the ordinary meaning of the word "govern." To "'govern' means 'to prevail or have decisive influence; control.'" *Humana*, 806 F. Supp. 3d. at 648 (citing Merriam Webster); *see also Govern*, Black's Law Dictionary (12th ed. 2024) (defining "govern" as "to control a point in issue"). The technical specifications that CMS uses to calculate Star Ratings measures, which in turn affect Medicare Advantage organizations' entitlement to quality bonus payments each year, do not "have decisive influence" or "control" over a Medicare Advantage organization's eligibility to furnish benefits. First, the measure specifications do not govern the overall Star Rating that a Medicare Advantage organization receives in a given year because they do not contain any legal standard or deciding principle related to termination. Second, by the regulation's terms, the Star Rating calculation process in any given year does not govern whether CMS may terminate a plan: Only if a plan receives a summary rating of less than three stars for "3 consecutive contract years" does CMS have discretion to terminate a plan. 42 C.F.R. § 422.510(a)(4)(xi). And third, the regulation expressly allows, but does not require, CMS to terminate persistently low-performing plans. *See id.* § 422.510(a) (CMS "may" terminate a contract if it meets any of the listed criteria). Both "[t]he discretionary component of the low-performing provision and indirect nature of the Star Ratings metrics mean they are too attenuated to qualify as 'governing' eligibility for Medicare Advantage programs." *Humana*, 806 F. Supp. 3d at 648.

SCAN's reliance on its alternative definitions of "govern" is unavailing. Even under SCAN's alternative definitions, the Star Ratings measure specifications cannot be said to "govern[]

. . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits." § 1395hh(a)(2). For starters, SCAN fails to cite any Star Ratings measure specification that it purports to govern its eligibility to furnish benefits. CMS's Star Rating measure specifications as set forth in its Technical Notes document do not discuss Medicare Advantage contract termination, much less Star Ratings as a basis for termination. It is unclear how the Star Ratings measure specifications "control[] legal procedure," or act as "a rule, precedent, law, or deciding principle for," Pl.'s Opp. 26, for termination or eligibility to furnish benefits.

The legal standards that control the substance and procedure for termination are set forth in CMS's comprehensive termination regulations. *See* 42 C.F.R. §§ 422.508; 422.510; 422.512; *see also HMO Louisiana, Inc. v. HHS*, 179 F.4th 62, 69 (D.C. Cir. 2026) ("'Termination' under the regulations addresses the ability of CMS and a Medicare Advantage organization to end their contractual relationship."). Section 422.510 sets out the substantive and procedural bases for termination. And the "deciding principle," Pl.'s Opp. 26, for termination is set forth in § 422.510, not the Star Ratings measure specifications: CMS may terminate a Medicare Advantage organization if it "[a]chieves a Part C summary plan rating of less than 3 stars for 3 consecutive contract years." 42 C.F.R. §§ 422.510(a)(4)(xi); 423.509(x) (same for Part D).

SCAN argues that "CMS is . . . wrong that discretion over whether to terminate a plan means the Star Ratings thresholds do not 'govern' eligibility; the thresholds supply the standard, and any discretion operates within it." Pl.'s Opp. 27. The "thresholds" to which SCAN refers—"less than 3 stars for 3 consecutive years"—are set out in CMS's regulations, not the Star Rating measure specifications. It is true (although unlikely) that one given measure specification in CMS's Technical Notes could make the difference between half-star increments. But the Star Rating a Medicare Advantage organization's contract receives in a given year is completely

incidental to the "thresholds" and "deciding principle[s]" for termination set forth in regulation. Because CMS's regulations concerning termination govern eligibility and CMS's measure specifications do not, Star Ratings measure specifications do not "govern[] . . . the eligibility of . . . entities, or organizations to furnish . . . services or benefits" under § 1395hh(a)(2).

### C. Star Ratings measure specifications do not govern the scope of benefits.

Medicare Advantage organizations may choose to offer supplemental benefits to beneficiaries regardless of their Star Ratings. The Star Ratings therefore do not "govern" the scope of benefits. Plans are statutorily obligated to provide the same benefits as original Medicare, 42 U.S.C. § 1395w-22(a)(1)(A), and each plan "may provide to individuals enrolled under this part . . . supplemental health care benefits that the Secretary may approve," 42 U.S.C. § 1395w-22(a)(3). These provisions do not depend at all on the Star Ratings.

SCAN's position appears to be that if plans with higher Star Ratings use the resultant funds to "provide [beneficiaries] with additional benefits" and lower premiums, those payments "govern" the scope of benefits. *See* Pl's. Opp. at 29-30. SCAN, however, may offer whatever supplemental benefits it wants, regardless of its Star Rating, as long as the Secretary has approved them (which he "shall" unless he determines that approving them would "substantially discourage enrollment," 42 U.S.C. § 1395w-22(a)(3)(A)). SCAN claims that it is less economical for it to offer these benefits because its lower Star Rating means lower quality bonus payments, but SCAN has failed to show that the Star Ratings measure specifications "govern" the "scope of benefits." SCAN points out that "the Medicare Act does not permit plans to offer unfunded benefits untethered from revenues (payments)" because "[t]o meet CMS's actuarial standards, plans must link benefits with the revenues to offer them." Pl.'s Opp. 29 (citing 42 U.S.C. §§ 1395w-24(a)(6)(A), (B)(ii)). But a requirement that plans' bids explain how benefits relate to revenues does not in any way "govern" the scope of benefits that a plan offers. That plans' resources are

finite, and they therefore cannot offer unlimited benefits. But that does not mean that the Star Ratings measures specifications (which inform Star Ratings, which in turn dictate quality bonus payments) "govern" the scope of benefits a plan offers.

SCAN again contends that "governing" refers to "a legal standard that 'control[s] legal procedure for (an action, practice, process, etc.),' for example, in the phrase 'laws that govern the sale of alcohol.'" Pl.'s Opp. 26 (quoting *Govern*, Webster's Dictionary Online). SCAN again fails to cite any Star Ratings measure specification that it purports to govern scope of benefits under this standard. The legal standards governing scope of benefits are, for core Medicare Part A and B covered services, set out in § 1395w-22(a)(3), and for services forming supplemental benefits, § 1395w-22(a)(3). CMS's regulations define supplemental benefits and set out certain mandatory requirements. *See* 42 C.F.R. § 422.100(c)(2)(i)(A)-(B), (ii). A supplemental benefit, must, among other things, "benefit[] diagnose, prevent, or treat an illness or injury." CMS's regulations concerning supplemental benefits provide legal standards that constrain the scope of benefits that plans may offer. The Star Ratings measure specifications do not similarly "control[] legal procedure," or act as "a rule, precedent, law, or deciding principle for," Pl.'s Opp. 26, the scope of benefits plans determine to offer.

## III. <u>Any Relief Should be Appropriately Limited</u>

SCAN cannot show that the Star Ratings measure specifications fall within the ambit of § 1395hh(a)(2). If this Court disagrees with the government's arguments, however, it should remand to the agency to recalculate SCAN's Star Rating consistent with the Court's opinion. SCAN requests that this Court grant it extraordinary relief in the form of a detailed remand order because it views CMS's representation that it would afford SCAN appropriate rebate relief consistent with an order from this Court as too equivocal. Pl.'s Opp. 32-33. Specifically, SCAN

requests that this Court "order CMS to take the operational predicate steps necessary to afford rebate relief, including facilitating the resubmission of any bid documents." *Id.* at 32. If the Court disagrees with CMS on the merits, it should not order CMS to facilitate the resubmission of any bid documents. The APA requires a reviewing court only to "hold unlawful and set aside agency action" found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and no more. 5 U.S.C. § 706(2)(A).

SCAN claims that CMS is "reserving for itself whether [its required relief] is 'required' and 'appropriate.'" Pl.'s Opp. 33. This is wrong—CMS has stated repeatedly and unequivocally that "[i]f required to [by the Court], CMS would afford SCAN appropriate rebate relief." Defs.' Br. 24. CMS's representations to SCAN do not justify its request for extraordinary relief. That "CMS is telling the Court that it would only take the needed operational steps to effectuate rebate relief 'if required,'" Pl.'s Opp. 34, is unremarkable. If the Court agrees with CMS that the Star Ratings measure specifications need not be promulgated "by regulation," 42 U.S.C. § 1395hh(a)(2), there would be no basis for effectuating rebate relief.

CMS has no obligation to delineate the "necessary operational steps to ultimately provide for rebate relief following a judgment in SCAN's favor," *id.* at 33, when entitlement to relief is at this juncture purely hypothetical. Failure to provide assurances about how an agency might operationalize a decision favorable to a plaintiff to that plaintiff's satisfaction is not a basis for a plaintiff to request entry of a detailed remand order beyond what the APA provides. "Under settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards." *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995). To do otherwise would "'intrude upon the domain which Congress

. . . exclusively entrusted to an administrative agency.'" *FDA v. Wages and White Lion Invs.*, 604 U.S. 542, 587 (2025) (quoting *SEC v. Chenery*, 318 U.S. 80, 88 (1943)).

In every other case in which a district court has determined that CMS has erred in calculating a Medicare Advantage organization's Star Rating, it has entered the more modest relief of setting aside the Star Rating: "Other courts dealing with Star Ratings-related litigation have noted, in formulating relief, that 'courts should, where possible, leave it to administrative agencies to determine in the first instance how best to implement a judicial decision that alters the relevant legal framework.'" *Clover Ins. Co. v. HHS,* No. 2:25-CV-142, 2026 WL 1483515, at *25 (S.D. Ga. May 27, 2026), *on reconsideration in part*, No. 2:25-CV-142, 2026 WL 1510382 (S.D. Ga. May 29, 2026) (quoting *Elevance Health, Inc. v. Becerra*, 736 F. Supp. 3d 1, 25-26 (D.D.C. 2024)). The *Clover* court consequently set aside Clover's 2026 Star Rating and ordered CMS to redetermine that Star Rating in a manner consist with this Order. *Id.*

SCAN cites *In re Long-Distance Telephone Service Federal Excise Tax Refund Litigation*, 751 F.3d 629, 634 (D.C. Cir. 2014) for the proposition that "[t]he scope of the remedy in an APA case, including any injunctive orders controlling the remand, 'depends entirely on the underlying statutory obligation of the agency,' *i.e.*, the nature of the agency's 'statutory duty' on remand." Pl.'s Opp. 34. But that case makes clear that "[w]hen . . a rule is promulgated without notice and comment, the APA directs the court to 'hold unlawful and set aside [the] agency action'" and nothing more. 751 F.3d at 634. The Court explained that the "APA also permits a court to 'compel agency action unlawfully withheld.'" *Id.* (citing 5 U.S.C. § 706(1). "But that provision applies only to '*discrete* action' that is 'legally *required* . . . about which an official had no discretion whatever.'" *Id.* SCAN has not sought relief under § 706(1) and does not explain what statutory provision requires CMS to facilitate resubmission of bid documents.

Remand without detailed instructions is especially appropriate here so that CMS can consider whether "taking further action consistent with the corrected legal standards," *PPG Indus., Inc.*, 52 F.3d at 365, requires CMS to exclude all measures used to calculate SCAN's Star Ratings on the basis that none of them were promulgated through notice-and-comment rulemaking. SCAN has conceded that "CMS is likely correct that there are other measures that could be subject to the same as-applied attack [alleging that 1395hh(a)(2) requires those measure to be promulgated through notice-and-comment rulemaking]." Pl.'s Opp. 35. SCAN additionally argues that CMS has discretion to "treat as invalid additional measures going beyond the scope" of measures challenged. If, therefore, the Court agrees with SCAN on the merits, CMS is obligated on remand to determine what additional measures, if any, should be excluded from SCAN's Star Ratings.

Dated: October 6, 2026

Respectfully submitted,

JEANINE FERRIS PIRRO
United States Attorney

By: */s/ William Thanhauser*
WILLIAM THANHAUSER
D.C. Bar #1737034
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
(202) 252-7706

*Attorneys for the United States of America*

*Of Counsel:*

BENJAMIN A. ROBLES
Acting General Counsel

ELIZABETH C. KELLEY
Deputy General Counsel
Chief Legal Officer for CMS

BETSY M. PELOVITZ
Associate General Counsel

MICHAEL J. GERARDI
Deputy Associate General Counsel for Litigation

KENNETH R. WHITLEY
Attorney
Department of Health and Human Services
Office of the General Counsel